1. In a case involving the enforcement of a town ordinance, where the amount in dispute is below the lower limit of the jurisdiction of this court, the appeal will be dismissed, when the judgment appealed from was based on the facts of the case, and not on the unconstitutionality or illegality of the ordinance in question.

(Syllabus by the Court.)

Appeal from Seventh Justice's Court, Parish of Sabine; John Graham, Judge.

Action by L. V. Gibbs against W. B. Atkins, mayor, and others. Judgment for plaintiff, and defendants appeal. Dismissed.

Armstrong & Good, for appellants. L. V. Gibbs, in pro. per.

PROVOSTY, J. Some hogs were impounded, and the owner brought suit before the magistrate against the mayor and the town marshal for their release. The magistrate thought the impounding proceedings were irregular, and ordered the hogs released. It seems that the town marshal had delegated the powers confided to him by the town ordinance for the impounding of hogs to two little boys, which the magistrate considered to be irregular—these powers having been confided to the officer to be exercised by himself in person, and not by deputy; also that the hogs were inoffensive, unsuspecting country porkers, which these youthful myrmidons of the town marshal had enticed or invited into the town by spreading their path with corn, which the magistrate considered to be unwarranted. The magistrate's reasons for judgment are in the record. They show that the judgment was based exclusively upon the above considerations, and not upon the illegality or unconstitutionality of the ordinance under which the impounding took place. Our attention is called to this fact, and to our not having jurisdiction of the case. Inasmuch as this court could have had jurisdiction of the case only if the illegality or unconstitutionality of the ordinance in question had been involved, it is evident we must dismiss the appeal for want of jurisdiction. The appeal is accordingly dismissed.

(34 South. 411.)

### No. 14,689.

### WARREN v. GOODWYN et ux.

(May 11, 1903.)

#### VENDOR AND PURCHASER—BREACH OF CONTRACT—AUTHORITY OF AGENT—DAMAGES.

1. A person desirous of purchasing in entirety the interests of three joint owners of a plan-

tation entered into a correspondence with the husband of one of the joint owners as to the terms upon which he could buy the place. Asserting that in this correspondence the party written to dealt as agent of the joint owners, under a claim of full authority to act in the premises, which was not justified by the fact, and that under this claim of authority and agency he entered into a promise of sale to him of the plantation, which the joint owners refused to carry out, he sued for damages. *Held* that, under the facts of the case, the demand was not well grounded.

(Syllabus by the Court.)

Appeal from Judicial District Court, Parish of Grant; W. F. Blackman, Judge.

Action by J. M. Warren against H. G. Goodwyn and wife. Judgment for defendants, and plaintiff appeals. Affirmed.

Joel L. Fletcher, Scheen & Stephens, E. H. Carter, and William A. Wilkinson, for appellant. John Alexander Williams and William Butler Clarke, for appellees.

### Statement of the Case.

NICHOLLS, C. J. The defendants in this action are Howard G. Goodwyn and his wife, Mrs. Luella D. Goodwyn.

Plaintiff alleged that Howard G. Goodwyn, claiming to be the agent of Alfred W. Lewis and Mrs. Lavinia A. Hadnot, and to have full power from them to transfer their interest in what was known as the "Crescent Plantation," in the parish of Red River, did, as their agent, obligate and bind them to sell the same to him for the price of $11 per acre, payable one-third cash, the balance in five equal payments, with 8 per cent. interest from date of sale until paid, when in truth he had no authority from them to make said sale, or at least he exceeded his power as agent for them in entering in the said agreement to sell, and under the law he was bound in his individual capacity to petitioner for the damages which he sustained. That he acted within the scope of his authority as agent for his wife, Mrs. Luella D. Goodwyn, in entering into the aforesaid agreement to sell her interest in the Crescent Plantation, and she was bound to him, jointly and in solido with her husband, for the losses and damages which he suffered on account of the violation of the agreement.

That the interest of Alfred W. Lewis, Mrs. Lavinia A. Hadnot, and Mrs. Luella D. Good-

wyn in the Crescent Plantation amounted to 705 acres, and the same was well worth the sum of $18 per acre, and, by the violation of the agreement to sell to petitioner, he had suffered a loss and deprivation of profits, etc., in the sum of $7 per acre, aggregating the sum of $4,935, for which sum he was entitled to a judgment against them jointly and in solido. That he accepted said promise of sale on the terms proposed, and was ready and willing to perfect said sale in accordance with same, by acceptance of formal deed, paying cash portion of purchase price, and signing notes for deferred payments, and in furtherance of said acceptance he made and executed to W. A. Wilkinson a special power of attorney, authorizing and empowering him to perfect said sale in accordance with the terms of said agreement, by signing formal deed and mortgage for the unpaid price, as well as notes for said credit price, and paying the cash price agreed upon.

That Alfred W. Lewis, Mrs. Lavinia A. Hadnot, and Mrs. Luella D. Goodwyn had totally and persistently failed and refused to comply with said agreement with petitioner, as Howard G. Goodwyn, acting as their agent, agreed to do, under the terms and conditions of said agreement, notwithstanding the said Howard G. Goodwyn, agent and attorney in fact, had been put in default and in mora by petitioner, and also through his said agent and attorney in fact. That Howard G. Goodwyn admitted that he had acted beyond his authority from Alfred W. Lewis and Mrs. Lavinia A. Hadnot, in agreeing to sell their interest, as set forth, but avowed and affirmed his authority to make said sale for Mrs. Luella D. Goodwyn, but he totally and persistently refused and declined to comply with said agreement according to its terms and conditions for Mrs. Luella D. Goodwyn.

That Alfred W. Lewis, Mrs. Lavinia A. Hadnot, and Mrs. Luella D. Goodwyn sold and transferred the property which they agreed to sell to petitioner on the 23d day of November, 1900 (that being the day he, Wilkinson, demanded of Howard G. Goodwyn a compliance with the agreement), in open and flagrant violation of said agreement, and by such sale and transfer the parties whom the said Howard G. Goodwyn pretended to be his principals were unable to comply with the agreement.

Defendants answered. After pleading the general issue, they denied that plaintiff had suffered any of the losses or sustained any of the damages claimed in the petition. H. G. Goodwyn denied that he ever represented to plaintiff that he had any authority to sell the land to the plaintiff; averred that he had frequently told him that he had not, and plaintiff well knew that he had no, authority to sell the land in controversy, or any part thereof.

Luella D. Goodwyn denied that she had ever offered to sell the land, or any part of same, to plaintiff, and averred she had never authorized Goodwyn or any one else to sell her interest in same.

The other defendants denied that there had ever been any price and terms agreed upon for the sale of the land referred to, or that plaintiff had ever complied or offered to comply with any of the conditions and terms, as stated in petition.

They prayed that plaintiff's demand be rejected at his cost.

The district court rendered judgment in favor of the defendants and against the plaintiff, and the latter appealed.

On the 13th of October, 1900, the plaintiff wrote the following letter to the defendant:

"New Cut Store, La., Oct. 13, 1900. Mr. H. G. Goodwyn, Colfax, La.—Dear Sir: If you would like to sell the major heirs' interest in the Lewis Plantation, let me know the least money will buy it, ⅓ Cash, balance in five equal payments each payment being made January 1st of each year until paid, with interest to be only one year on each note—mortgage retained on land until paid for. Let me know at once as I am figuring on buying another place but prefer this on account of joining my sister Mrs. Murrel. Respectfully, J. M. Warren."

The property here referred to was a specific portion of the Crescent Plantation, owned in indivision by A. W. Lewis and his two sisters, Mrs. Hadnot and the wife of the defendant H. G. Goodwyn.

The offer made was, as will be seen, to buy the interest of the three owners in entirety.

On the 13th of October the defendant Goodwyn answered, saying: "The majors' portion of the Lewis estate is 726 acres in Southern part of the tract. I can sell to you at $10 per acre for cash or on the terms you offer

at $11 per acre—⅓ cash balance in five payments. If you mean business we can trade at once and you can be put in possession by January 1st, as Marston's five-year lease expires December 31st. If we trade and you want it, I can also lease you the upper portion of place belonging to the minors for 3 or 5 years. They have 793 acres. There are about 420 acres of open land about equally divided between the majors and minors. Will want $500 a year rent for the minors. Yours truly, H. G. Goodwyn."

This was followed by a second letter from the plaintiff, in which he said:

"Yours received about the Lewis land of major heirs stating you would sell me the majors' portion for $10 per acre cash and $11 per acre on terms of five years by paying ⅓ cash and bal. in five years—interest only on note each year as they are due. As to my renting the minor heirs' portion if I trade with you I will rent it if there is No. acres you say. Please let me know at once. Of course if I buy I will expect you to have the line established between major heirs and minor heirs. Respectfully J. M. Warren.

"I mean business I want the place and hope we can trade. If we trade I would like to do it at once as I would try and stock it with mules and hands for next year. Resp'y, J. M. Warren."

Goodwyn answered as follows on October 23:

"My co-proprietors will not agree to sell for less than $11 per acre on the terms you name viz. ⅓ cash balance in 5 years equal payment notes to bear 8% interest per annum. Myself and one or two others in interest expect to be on the place about Nov. 1st or 5th to survey off the divisions. Yours truly H. G. Goodwyn."

On the 26th of October plaintiff wrote again, saying:

"Yours received yesterday stating that you would not take less than $11 per acre for the major heirs' interest in the Lewis place ⅓ cash-bal. on terms of 5 years. I will say in reply that I will take it. Just consider the place sold and if there is No. of acres you say to minors' part of open land, I will rent it at price you state $500. Consider the rent a trade. I will be ready to make you payment of ⅓ cash when abstract deed is made and division is made between majors

and minors. Let me know for certain if you will be up Nov. 1st to survey it off as I want to be present at the time it's surveyed. I want January 1st. Respy, J. M. Warren."

On October 30th, Goodwyn wrote:

"In reply to your favor of the 26th agreeing to purchase the 726 acres more or less falling to the 3 major heirs of Lewis place at $11 per acre payable ⅓ cash balance in 5 equal payments with 8% interest from date until paid will say that the proposition is accepted with the single proviso that the notes of each party is to be made in their individual favor. In other words instead of 5 notes you are to give 3 different parties 5 notes each making 15 notes all told payable in 1, 2, 3, and 5 years. It amounts to the same thing so far as you are concerned. We will join in one act to you to simplify matters and save costs of recording," etc.

The writer then proceeded to give the chain of title of the plantation, saying, "The abstract of title is simple and for convenience it can be recited in the sale to you." He then passed from the subject of sale to that of the renting of the minors' property, closing with the statement, "I will be on the place Nov. 12th to 15th for the purpose of running the dividing lines and will be glad to have you on hand."

On November 6th plaintiff wrote Goodwyn, saying: "Yours received a few days since and will say in reply that I have just returned from Coushatta and find a mortgage on major heirs' part of place to amount $999 in favor of G. W. Sentell given by A. W. Lewis. I suppose he will take that mortgage off before you all deed me the place. It will be all right to make me a deed on Dec'r 31st. I am ready to pay ⅓ Dec'r 1st cash but would want my notes due each year somewhere about March 1st so as to give mᵒ time to ship cotton each year." The writer then passed to the subject of renting the minors' property then under lease to Marston, saying: "What kind of agreement have you with Capt. Marston about the improvements when he gives the place up—the place improvements has run down and if Marston is to place them like he got them would like if you would notify him to do it —that you have sold. Let me hear at once. Will you come to Coushatta to make me

deed on Dec'r 1st. How about the fence between Marston and you. Is he not to build one when he gives up the place. I will be with you when you survey the lines off to the place if you will let me know the day to meet you."

Goodwyn answered to this letter on November 8th. In the reply he said: "The $999 mortgage of A. W. Lewis' share will be discharged. It has been about ¾ paid already. Will be on place as soon Monday morning Nov. 12th as we can get there by train and will see what arrangement we can agree upon as to time notes fall due."

On the same day he wrote to the plaintiff from Colfax as follows: "In the matter of making deed we desire you to come here as Mr. Lewis and myself live here in Colfax and Mrs. Al Hadnot 15 miles distant. We can have her to come to Colfax at any date agreed upon but it is altogether inconvenient for her to get to Coushatta as we have to go 30 miles to get to the railroad."

It is upon this correspondence, coupled with the fact that the property was sold by the owners before the 31st of December to Mr. Marston, that plaintiff bases his demand for damages.

## Opinion.

Defendant denies that he acted in this matter, pretending to be the agent of Alfred W. Lewis and Mrs. Lavinia A. Hadnot, and claiming to have full power from them to transfer their interest in the Crescent Plantation, and bind them, as their agent, to sell their interest in the Crescent Plantation, as alleged by the plaintiff. He denies that there was ever any aggregatio mentium as to a sale, or a promise of sale; that negotiations were ever closed. Counsel insists that plaintiff simply wrote to the defendant as a convenient way of ascertaining the views of the owners, and not to him as acting or claiming or pretending to act for them as their agent; he served (they say) as a mere letter writer between the parties; that plaintiff knew that the owners all lived in Colfax, and that a transfer of the property, if agreed to, would have to be made later in writing, and be signed, not by him, but by all the owners themselves; that he knew, if he had or claimed to have any authority in the premises, it would necessarily have to be

evidenced by a writing; that he made no inquiries at all on the subject, as he was well aware that he was not pretending to act as agent.

It is unnecessary for us to discuss the question as to whether Goodwyn acted or claimed to act as the agent of the owners, for the reason that, assuming that he did so act, matters never reached the point of a completed agreement through anything he did. If the correspondence between the parties had been handed to a notary, with directions to write up an act of sale based upon it, it is clear that he would have been unable to do so through the correspondence itself. He would have been forced to ascertain what subsequent agreement had been made between the parties as to the number of notes and their maturities. Defendant's letter of November 8th to the plaintiff shows that certain matters between the parties were still open. He said, "Will be on place as soon Monday morning Nov. 12th as we can get there by train and will see what arrangement we can agree upon as to time notes fall due." The word "we," in this letter, referred to defendant and to A. W. Lewis, one of the owners, who was to, and did, accompany him to the plantation.

The evidence shows that those parties did go to the plantation. Defendant testified, in answer to the question whether he remembered the substance of a conversation he had with plaintiff with reference to the payment of the deferred notes for the purchase price of this place in full, that "on the evening of the day of their arrival, or the next morning, he told plaintiff that Mr. Lewis represented himself and his sister Mrs. Hadnot in this transaction, and that he himself represented his wife; that Mr. Lewis, on part of himself and sister, were dissatisfied about the trade on the terms and manner which we [witness and Warren] had been discussing, and opposed the sale on those terms, and that he would have to see Mr. Lewis, for he represented a two-thirds interest in the matter; and so then he left me, and went to see Mr. Lewis. Our conversation was with reference to the deferred payments. I then told Mr. Warren that we had an offer for the place, on which his bid had been raised, and I was sorry he could not find the place worth the money—at least, that he could not

meet the raise. He told me he thought I was bound by my letters and agreements to make the sale, and I told him that, if I was bound by the law, that Mr. Lewis and Mrs. Hadnot were not, and, until he could get Mr. Lewis to agree on his part and the part of Mrs. Hadnot, I was powerless to act. There was a good deal of discussion. Mr. Warren wrote me that he wanted the notes made [payable] on the 1st of March each year, and I wrote him we would want the notes made [payable] by the 1st of December each year, for that reason we understood on December. He contended that it would be inconvenient to get the money before the 1st of March each year. He never consented to making those notes payable on the 1st of December each year, as we demanded. We never came to any definite understanding. I always, all the way through, when the matter was discussed, tried to keep him informed that when the trade was made the parties would have to sign the deed. That was my intention in all of my letters and conversations. I never told Mr. Warren, either verbally or in writing, that I was agent and had the authority to sell the interest of Mr. Lewis and Mrs. Hadnot. I told Mr. Warren that I could not sell Mr. Lewis' or Mrs. Hadnot's interest to that land. I told him that, while I was not able to sell their interest, he might hold me to the sale of my wife's interest, but I did not think he could; but he said he did not give a damn for that part of it, as it would take all a man made to fence it. My wife usually did what I requested her. I did not question her about it [her not selling her interest to Warren]. The reason she did not carry out that contract was because she could get more, and because Mr. Warren told me that he did not propose to hold me as to my wife's interest, as it was a shoestring, and he did not want it."

Lewis testified that he "had a conversation with plaintiff something like this: He was speaking of the deal, and talked about the notes being made, and about the sale of my interest in the place—when the notes were to be made due—and I told Mr. Warren that I had not decided to sell my interest in the land yet. He got up and read a letter from Mr. Goodwyn. I told him I could not help what Mr. Goodwyn said or did; that I was

there to represent myself and Mrs. Hadnot, and that she would stand by me in anything that I did. He came to discuss with me the matter of this sale. I do not think he ever consented to make the notes due in December. I do not think he made any propositions to do so, as I told him that I had not decided to sell my part of the land. When he read the letter from Mr. Goodwyn, I said then and there that Mr. Goodwyn had written more than he had any authority to do; and we discussed the matter, and I refused to sell my part of the land. So far as that was concerned, I refused to sell before I knew that Mr. Marston ever made a proposition. Warren did not agree to purchase my interest in the place on the terms and upon agreements between him and Goodwyn to make the notes payable on the 1st of December."

On cross-examination he testified that Mr. Goodwyn had authority to sell the land only on condition. "I told him, if everything proved as he said, when I got there, I would sell, but not if otherwise. When Goodwyn wrote those letters, I did not tell him to make the sale. I told him that, if everything was as he represented, I would sell. I found more land than could be put in cultivation."

Warren testified that he had consented from the beginning to making the notes representing the deferred portion of the purchase price payable on the 1st of December; that he desired to have this changed to the 1st of March, but, the parties objecting, he acquiesced in this. He said that after Lewis and defendant went to the plantation the latter told him that Lewis was dissatisfied, and to go and speak to him, and he did speak to him, about the matter; that Lewis told him that Goodwyn had misrepresented the matter; that while they were conversing Mr. Marston (the party to whom the owners afterwards sold the property) came up, and also defendant and Mr. Gunn. In answer to the question asked him—whether, "in his conversation with Mr. Lewis, he [Lewis] had ever consented to executing the deed in accordance as alleged in agreement between you [witness] and H. G. Goodwyn [defendant]," he answered, "Yes, sir; and, in 5 minutes after, refused."

We are satisfied, from a consideration of the whole evidence, that negotiations up to the time when Lewis and the defendant went to the plantation, when Goodwyn left them and Lewis took them up, were not closed, but were still open, and therefore defendant was free from all liability and responsibility for the ultimate result, whether he had acted or claimed to have acted as agent or not. Independently of this, if Lewis consented to execute the deed of sale according to the terms and conditions which plaintiff alleges had been agreed upon between himself and Goodwyn, as plaintiff testified that he did consent, he could not subsequently withdraw the consent so given, to defendant's injury. The failure to consummate the sale under such circumstances would not be due to Goodwyn's want of authority in the premises, but to Lewis' action in the matter.

The moment that Lewis and Mrs. Hadnot refused to make a sale of their interests in the land, the whole matter necessarily ended, for plaintiff admits that he did not offer to buy the undivided interests of any one of three joint owners, but the entire interests of the three. He did not want the interest held by Mrs. Goodwyn, and she was powerless to control the action of her co-owners. If the plaintiff has suffered any damages, it is due in great part to his own fault and negligence. He knew that, if defendant had any authority in this matter, he could only have had it under a writing, and yet he made no inquiries whatever. He was satisfied to act on presumptions and deductions. We find quoted in Dalloz & Vergé, under article 1997, Code Napoleon, a decision to the following effect: "Celui qui s'est donné comme simple fondé de pouvoir verbal, et qui ne s'est pas engagé personnellement à rapporter la ratification du mandant, n'est pas tenu au cas de désaveu pas ce dernier de dommages-intérêts envers celui avec qu'il a contracté comme mandataire verbal: c'est au tiers qui a traité avec ce pretendu mandataire à s'imputer de ne pas avoir exige d'autre garantie. Req. 14 Brum. An. 14 J. G. 304, Mandat."

We find no error in the judgment appealed from, and it is hereby affirmed.